**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SIERRA CLUB, INC.,

       Plaintiff,

v.                               Case No:  6:14-cv-1877-Orl-40DAB

ST. JOHNS RIVER WATER
MANAGEMENT DISTRICT,
GOVERNING BOARD OF THE ST.
JOHNS RIVER WATER
MANAGEMENT DISTRICT, JOHN
MIKLOS, MARYAM GHYABI, FRED
ROBERTS, JR., GEORGE ROBBINS,
DOUGLAS BOURNIQUE, CHARLES
DRAKE, LAD DANIELS, DOUGLAS
BURNETT, CARLA YETTER, and
MIAMI CORPORATION,

       Defendants.
_____

## ORDER

    This cause comes before the Court on Defendant St. Johns River Water

Management District's[1] (the "District") Dispositive Motion to Dismiss Second Amended

_____

[1]   Plaintiff Sierra Club also brings suit against "John Miklos, Maryam Ghyabi, Fred
Roberts, Jr., George Robbins, Douglas Bournique, Charles Drake, Lad Daniels,
Douglas Burnett[,] and Carla Yetter, in their official capacities as members of the
[St. Johns River Water Management District] Governing Board . . . ." (Doc. 73 at
1.) However, Lad Daniels' term as a member of the District's Governing Board
ended on April 7, 2015, so Ron Howse, his successor on the Governing Board, is
automatically substituted as a party, pursuant to Federal Rule of Civil Procedure
25(d). *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer
who is a party in an official capacity dies, resigns, or otherwise ceases to hold office
while the action is pending. The officer's successor is automatically substituted as
a party.").

Complaint for Lack of Subject-Matter Jurisdiction and Failure to State a Claim Upon Which Relief Can be Granted and Motion to Strike (Doc. 76), Defendant United States Army Corps of Engineers' (the "Corps") Rule 12(b)(1) Motion to Dismiss (Doc. 77), and Intervenor Miami Corporation's Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, Motion for Summary Judgment (Doc. 78).   In response, Sierra Club filed its Consolidated Response in Opposition to Motions to Dismiss Second Amended Complaint (Doc. 82).   For the reasons that follow, the Motions will be denied.

## I.   BACKGROUND[2]

This case challenges several actions undertaken by the District, Miami Corporation, and the Corps[3] (collectively, "the Defendants"), concerning the Farmton Mitigation Bank (the "FMB").   (Doc. 73 ¶ 1.)   Located in Volusia and Brevard counties, the FMB is "the largest federal mitigation bank in the United States" and makes up approximately "24,000 acres lying within the approximately 57,000 acre Farmton tract owned by Miami Corporation."   (*Id.*)   According to the 2000 FMB Enabling Instrument (the "Enabling Instrument"), which established the FMB, "[t]he importance of this

---

[2]   This account of the facts is taken from Sierra Club's Second Amended Complaint (Doc. 73), the allegations of which the Court must accept as true to the extent Defendants' move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

[3]   Sierra Club also names "Colonel Alan M. Dodd, [] Chief Engineer of the Jacksonville District of the Army Corps of Engineers [who] has authority for overseeing federal mitigation banks in the State of Florida, including the FMB" as a defendant.   (Doc. 73 ¶ 21.)   Per Federal Rule of Civil Procedure 25(d), Colonel Jason A. Kirk is substituted for Colonel Dodd.   Fed. R. Civ. P. 25(d).

proposed bank is that it will preserve in perpetuity a very large amount of habitant . . . [and insulate it from] residential, commercial or agricultural development . . . [by creating] [s]ufficient legal interest and financial responsibility [] to ensure perpetual protection." (*Id.* ¶ 30.)   As mitigation credits are sold pursuant to the Clean Water Act's ("CWA") section 404 compensatory mitigation program, Clean Water Act § 404, 33 U.S.C. § 1344(b)(1), conservation easements are recorded on the corresponding parcels of land in the FMB.   (Doc. 73 ¶¶ 30–31.)   The District "works in tandem with the Corps to administer the FMB" by serving on the FMB "inter-agency review team" (the "IRT") and serving as "grantee of conservation easements in the FMB."   (*Id.* ¶ 23.) Miami Corporation, in furtherance of the environmental conservation goals of the FMB, "is dedicated to establishing [the FMB] as a mixed-use conservation area by retaining enough low-impact forestry and hunting to provide management funding for the bank in perpetuity."   (*Id.* ¶ 32.)

However, Sierra Club alleges that "while managing the FMB as a mitigation bank and selling credits, Miami Corporation has simultaneously pursued long term plans to use and develop the FMB in ways that are not consistent with [its] perpetual preservation . . . ."   (*Id.* ¶ 33.)   Specifically, Miami Corporation requested and received a "comprehensive plan amendment" from the Volusia County Council, which "authorize[d] 23,100 residential development units and 4.7 million square feet of non-residential development in the Farmton tract."   (*Id.* ¶¶ 33–34.)   Known as the Farmton Local Plan, this amendment allows residential and commercial development, with attendant infrastructure, "to be constructed directly inside the original boundaries of the

FMB . . . ."   (*Id.* ¶¶ 34–35.)   Separately, the Brevard County Commission adopted the Farmton Local Plan and approved residential and commercial development within the Brevard County portion of the FMB.   (*Id.* ¶ 36.)

Sierra Club takes issue with several distinct actions taken by the Defendants, each allegedly in furtherance of a plan to develop FMB land.   On September 29, 2011, the District issued Permit No. 4-127-76185-4 (the "Permit") to Miami Corporation, enabling it to "remove 1,165.35 acres from the North Bank site of the FMB."   (*Id.* ¶ 46.) On May 1, 2012, the District issued a "Partial Release of Conservation Easement" to Miami Corporation, which released "land encumbered with a conservation easement that is located within the FMB."   (*Id.* ¶ 47.)

The following year, on October 1, 2013, the Corps published a Memorandum of Record empowering Miami Corporation "to remove 374.77 acres of wetlands and 110 acres of uplands in the North Bank Site," but also removing a corresponding 38.97 mitigation credits from the FMB.   (*Id.* ¶ 43.)   Additionally, the Corps issued an "Updated Mitigation Banking Instrument" (the "Updated Enabling Instrument"), which reflected the "buffer credit reduction" the Corps imposed on Miami Corporation as a result of the requested land removal from the North Bank Site.   (*Id.* ¶ 44.)   Two companies owned and operated by Miami Corporation—Farmton Water Resources LLC and Farmton Services LLC—applied for and received permits from the District and the Florida Public Service Commission (the "PSC") to operate a wastewater utility on the Farmton tract.   (*Id.* ¶¶ 39–40, 48.)   Among those permits is a CUP authorizing Farmton Services LLC to pump 7,290,000 gallons per day of water from the Farmton

tract.  (*Id.* ¶ 48.)   In sum, Sierra Club challenges "[both] removals of land from the FMB; the authorization of residential and commercial development, as well as infrastructure inside the FMB; the removal of at least one conservation easement from land within the FMB; the use of the FMB as a project area for a water supply project; and the placement of a water and wastewater utility upon the bank" in addition to the Corps' promulgation of the Updated Enabling Instrument and "the various development activities that proceed from it."   (*Id.* ¶ 2.)

Sierra Club alleges that "[t]he massive residential and commercial development Miami Corporation has planned in and around the FMB . . . will have myriad negative impacts on the ecological carrying capacity of [the] entire region [and] will lead to habitat fragmentation, degradation, and diminishment, which will directly reduce the region's recreational and aesthetic value for Sierrans."   (*Id.* ¶ 11.)   As a result of the averred development in and around the FMB, the "at least eight Sierra Club members" who live "in close proximity to the FMB" and recreate in public conservation land abutting the FMB contend that "[t]hey will be injured by the construction of the Farmton Local Plan" due to the "intense residential and commercial development within the bank, together with the expansion of existing roads and the construction of entirely new roads leading in, out and through Farmton, thereby destroying the rural quality [of the land]."   (*Id.* ¶ 8.)   Specifically, Sierra Club members aver that they engage in "nature/bird/wildlife observation, hiking[,] camping, canoeing, fishing, swimming, photography, biking[,] and general recreation" in lands abutting the FMB.   (*Id.*)   Sierra Club contends that the Defendants' actions violate the CWA, the National

Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). (*Id.* ¶¶ 2–3.)

On November 18, 2014, Sierra Club filed a complaint against the District but did not name the Corps as a defendant.   (*See* Doc. 1.)   On January 14, 2015, the Court granted Miami Corporation's motion to intervene as a defendant.   (*See* Doc. 17.)   In lieu of responding to the then-pending motions to dismiss filed by the District and Miami Corporation, Sierra Club requested leave to file an amended complaint (the "Amended Complaint") (Doc. 28), which the Court granted.   (Doc. 31.)   Thereafter, Sierra Club filed a five-count Amended Complaint naming the Corps and the District as co-defendants and Miami Corporation as an intervenor.   (Doc. 36.)   On July 27, 2015, the Court entered an order (Doc. 70) dismissing the Amended Complaint for failure to state a claim upon which relief could be granted.   (Doc. 70 at 1.)

Sierra Club proceeded to file a six-count second amended complaint (the "Second Amended Complaint") (Doc. 73) on August 28, 2015.   (Doc. 73 at 1.)   Count I alleges "violations of the CWA, CWA regulations and APA by the Corps"; Count II avers "violations of the CWA and CWA regulations and APA by the Corps relating to by actions [sic] by non-federal actors in the FMB"; Count III asserts "the failure of the District and Miami Corporation to comply with the CWA and CWA regulations"; Count IV contends that "the Corps violated the APA and NEPA by failing to take a 'hard look' at actions in the FMB or prepare [sic] an environmental assessment or an environmental impact statement; Count V[4] alleges that "the District violated NEPA";

---

[4]   In the Second Amended Complaint, Sierra Club labeled two distinct counts both as

and Count VI alleges that "the Corps fail[ed] to respond to any comments and concerns as required by NEPA." (*Id.* ¶¶ 59–94.)   The District (Doc. 76), the Corps (Doc. 77), and Miami Corporation (Doc. 78) now ask the Court to dismiss the Second Amended Complaint. (*See* Docs. 76, 77, 78.)   Sierra Club filed a consolidated response in opposition the Defendants' motions (Doc. 82), and the Court granted the Defendants leave to file a reply (Doc. 85).

## II.   STANDARDS OF REVIEW

### A.   Challenges to Subject Matter Jurisdiction

Motions made pursuant to Rule 12(b)(1) attack a district court's subject matter jurisdiction to consider the case at bar.   Motions to dismiss under rule 12(b)(1) come in two forms: "facial attacks" and "factual attacks." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). Facial attacks only require the court to determine if the plaintiff has alleged a sufficient basis for subject matter jurisdiction.   *Id.* at 1529.   As such, the allegations within the complaint are assumed true for the purpose of the motion.   *Id.*   On the other hand, factual attacks challenge the existence of subject matter jurisdiction irrespective of what the complaint alleges.   *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260–61 (11th Cir. 1997).   Accordingly, in a factual attack, courts may consider information outside of the pleadings—including testimony, affidavits, and other evidence—and "may make factual findings necessary to resolve the motion." *Hawthorne v. Baptist Hosp., Inc.,* No. 3:08cv154/MCR/MD,

---

"Count IV."   (*See* Doc. 73 at 44, 46.)   So to avoid confusion, the Court will refer to the fourth count as "Count IV," the fifth count as "Count V," and the sixth count as "Count VI."

2008 WL 5076991, at *2 (N.D. Fla. Nov. 24, 2008).

Standing to bring and maintain a lawsuit is fundamental to invoking a federal court's subject matter jurisdiction.   *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006).   Challenges to a party's standing is a factual attack on the district court's subject matter jurisdiction that requires the court to look beyond the four corners of the complaint. See *Garcia*, 104 F.3d at 1260–61.

### B.    Failure to State a Claim

Motions made pursuant to rule 12(b)(6) challenge whether the plaintiff has made sufficient factual allegations to state a claim upon which relief can be granted.   In order to survive a rule 12(b)(6) motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007). District courts must accept all well-pleaded allegations within the complaint as true. *Id.* at 555.   An allegation is well-pleaded when the plaintiff alleges sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555.   Courts must view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994).

In a similar vein, a complaint also fails to state a claim upon which relief can be granted where the complaint fails to conform to Federal Rules of Civil Procedure 8 and 10.   Specifically, Rule 8 requires every complaint to contain a short and plain

statement of the grounds for the court's jurisdiction, a short and plain statement of the claims showing that the plaintiff is entitled to relief, and a demand for the relief sought. Fed. R. Civ. P. 8(a).   Rule 10 further requires all plaintiffs to state their claims "in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  Fed. R. Civ. P. 10(b); *see also* M.D. Fla. R. 1.05, 1.06 (providing specific local standards for pleading).   Failure to adhere to these pleading standards renders a complaint incapable of response and requires its dismissal or a more definite statement by the plaintiff.   *See Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).

## III.    ANALYSIS

District courts must address jurisdictional objections before analyzing the sufficiency of a complaint.   *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1242 (11th Cir. 1998).   Accordingly, the Court will evaluate the Defendants' respective 12(b)(1) challenges before considering the Defendants' 12(b)(6) arguments.

### A.    Subject Matter Jurisdiction

Collectively, the Defendants advance two subject matter jurisdiction arguments: Sierra Club's lack of standing and invocation of federal question jurisdiction.   The Court will consider each jurisdictional dispute in turn.

#### 1.    Standing

Standing to bring and maintain a lawsuit is fundamental to a federal court's subject matter jurisdiction.   *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006).   "The party invoking federal jurisdiction bears the burden of proving standing."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).   In order to prove standing, Sierra Club must satisfy Article III's constitutional standing requirements and NEPA's statutory standing requirements.   *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386, 1388–91 (2014).   Here, the Defendants argue that Sierra Club falls short of both Article III and statutory standing prerequisites.

### i.   Constitutional Standing

Since Article III standing is a "bedrock requirement" of federal judicial jurisdiction, its basic guidelines are familiar.   *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471 (1982).   "The irreducible constitutional minimum of standing contains three elements."   *Lujan*, 504 U.S. at 560. First, a plaintiff must demonstrate an "injury-in-fact" which is "(a) concrete and particularized" . . . and (b) 'actual or imminent, not conjectural or hypothetical.'"   *Id.* (quotations omitted).   In cases where an environmental injury is alleged, an acceptable injury-in-fact can consist of "a plaintiff claiming injury from environmental damage [in] the area affected by the challenged activity . . . ."   *Id.* at 565.   When a plaintiff invokes a procedural injury,[5] the imminence standard is loosened.   *See id.* at 572 n.7 ("Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing

---

[5]   In the Second Amended Complaint, Sierra Club asserts several quintessential procedural injuries; namely, the failure of the Defendants to procedurally comply with the CWA and NEPA.   (*See* Doc. 73 ¶¶ 38–94); *see also Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1171 (11th Cir. 2006) ("It is well-settled that, in a NEPA suit, 'a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared . . . .") (quotation omitted).

agency's failure to prepare an environmental impact statement, even though . . . the dam will not be completed for many years.").   However, the presence of an alleged procedural injury does not eliminate the injury-in-fact requirement, as "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."   *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).   To be actionable, an injury-in-fact in a procedural injury case must be "reasonably probable."   *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006) ("To show a cognizable injury in fact in a procedural injury case . . . [it must only be] reasonably probable that the challenged action will threaten these concrete interests.") (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 972 (9th Cir. 2006)).   Beyond injury-in-fact, constitutional standing also demands "a causal connection between the injury and the conduct complained of . . . [that must be] fairly traceable to the challenged action of the defendant . . . ."   *Lujan*, 504 U.S. at 560.   Finally, it must be "likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision."   *Id.* As with injury-in-fact, the Article III redressability element is relaxed in cases where a plaintiff claims a procedural right.   *Id.* at 572 n. 7.

All three Defendants dispute Sierra Club's constitutional standing.[6]   The Defendants contest each element of constitutional standing, although the bulk of their

---

[6]   As part of its response to the Defendants' standing and ripeness arguments, Sierra Club attached two affidavits to its response brief.   (*See* Doc 82-1; Doc. 82-7.)   The Defendants ask the Court to disregard these affidavits.   (Doc. 85 at 1–3.) Because the Defendants were denied an opportunity to depose the affiants and since the affidavits are not dispositive to the resolution of this Order, the Court

argument centers on a perceived lack of imminence.   Specifically, the Defendants

argue that "[a]ny such development [of former FMB land] is purely speculative . . . and

that any such development would require further regulatory action by state and federal

agencies."   (Doc. 77 at 4; *see also* Doc. 76 at 9–12; Doc. 78 at 11–13.)   In addition,

the Corps asserts that Sierra Club fails to allege "its members utilize properties for

which there are development plans and has not identified any specific mechanism by

which a particular development will affect property its members use."   (Doc. 77 at 6–

7.)   The District further contends that Sierra Club's "alleged injury from potential, future

construction of the Farmton Local Plan is not fairly traceable to the District's actions,

which do not authorize construction."   (Doc. 76 at 12.)   Lastly, the District claims that

the purported lack of causation destroys any redressability.   (*Id.*)

Sierra Club responds that the Defendants "are incorrect to assert that [Sierra

Club] must 'use the specific property that has been removed from the bank'" to pass

Article III muster.   (Doc. 82 at 11.)   Further, Sierra Club argues that its injuries are

imminent because "development of [the area] is and will continue to be an ongoing

development process," which also casually ties the complained of injuries to the actions

of the Defendants and ensures redressability.   (*Id.* at 12–17.)   Sierra Club posits that

its concrete injury is the "myriad negative impacts on the ecological carrying capacity

of   this   entire   region   [including]   habitat   fragmentation,   degradation   and

diminishment . . . [and] hydrological impairment of surrounding watersheds through

disruption of hydrological connectivity, surface water flows[,] and watershed integrity."

---

declines to consider these affidavits.

(Doc. 73 ¶ 11.)   Additionally, Sierra Club avers that its members "engage in various forms of aesthetic and recreational activities in the region surrounding the FMB," such as hiking, camping, and fishing.   (*Id.* ¶ 13.)   According to Sierra Club, "[i]t is undisputed that under the terms of the Farmton Local Plan, construction in [the land removed from the FMB] may commence in 2017" and Miami Corporation is already contemplating and pursuing development of the former FMB land.   (Doc. 82 at 23–25.)   As support therefore, Sierra Club points to several land use changes, development plans, and negotiations between Miami Corporation and regional governmental authorities.   (*Id.* at 14–16.)

Sierra Club's factual allegations satisfy the Court's constitutional standing inquiry.   As an initial matter, Sierra Club's averments of habitat degradation in areas where its members regularly recreate are prototypical environmental injuries, and are thus acceptable for the purposes of Article III.   *See id.* at 565.   However, Sierra Club asserts both a procedural injury (the failure of the Defendants to comply with CWA regulations and conduct a NEPA environmental analysis) and a concrete injury (ecological damage to the area Sierrans regularly recreate in).   (Doc. 73 ¶¶ 2–12.) As a result, Sierra Club need not "meet[] all the normal standards of redressability and immediacy."   *Lujan*, 504 U.S. at 572 n.7.   Indeed, the facts of this case are quite similar to Justice Scalia's hypothetical in *Lujan*, in which an individual living adjacent to the site for a proposed federally licensed dam would have standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though the proposed dam would not be completed for "many years."   *Id.*   Given Sierra Club's

contentions of extensive development actions—including impending construction, issuance of a groundwater pumping permit in the subject area, and multiple land use changes—coupled with the relaxed imminence standard applied to procedural injuries, Sierra Club adequately avers a reasonably probable, concrete, and imminent injury-in-fact.[7]  *See Ouachita Watch League*, 463 F.3d at 1170.

Nor is it of any moment that Sierra Club members do not recreate on FMB land or the land removed from the FMB.   It is enough to aver that the land Sierrans use is connected and adjacent to the land subject to development, since Sierra Club's alleged harms stem from the ecological decline of the region as a whole, including degradation of land Sierrans do recreate on.  *See Lujan*, 504 U.S. at 572 n.7 (standing for a hypothetical plaintiff living adjacent to a proposed dam); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015) (standing for organization's members who recreated in the "waters downstream" from a mining site); *Sierra Club v. Johnson*, 436 F.3d 1269, 1275–76 (11th Cir. 2006) (standing for an

---

[7]   The Defendants make much of the fact that "additional regulatory approvals must be obtained before [any] such construction can occur."   (Doc. 76 at 11.)   Though this assertion may be true, it nonetheless fails to defeat Sierra Club's constitutional standing or render its claims unripe because Sierra Club's complained of injury— failure to comply with NEPA and the CWA—arises from the final agency actions identified in the Second Amended Complaint, not from some future, unidentified agency actions.   *See Citizens for Better Forestry*, 341 F.3d at 975 ("The relevant inquiry for the immediacy requirement in the procedural context is whether there is a 'reasonable probability' that the challenged procedural violation will harm the plaintiffs' concrete interests, not how many steps must occur before such harm occurs.").   In their reply, the Defendants' reassert this position, but in the language of ripeness doctrine.   (Doc. 85 at 3–6.)   That, of course, does not change the fact that Sierra Club's claims derive from the Defendants' alleged past and current violations of NEPA and the CWA mitigation banking regulations, not from some future, other violation of those laws.

individual who "fishes near" a power plant and recreates in "the surrounding area"). Finally, despite the District's protests, Sierra Club's injuries can be fairly traced to the District and can be appropriately redressed by an order of the Court, should Sierra Club prevail.  Sierra Club identifies the District's release of an FMB conservation easement, issuance of a CUP to withdraw groundwater from the Farmton tract, and issuance of a permit to remove land from the FMB, as actions that will ultimately open the door to development in and around the FMB.  (Doc. 73 ¶ 23.)  In the event the Court determines that the Defendants failed to comply with NEPA or the CWA, it "has the power to order the [Defendants] to comply," rendering the averred injury redressable.  *Ouachita Watch League*, 463 F.3d at 1172–73.  In sum, Sierra Club's claimed injury meets each of Article III's constitutional standing requirements.

### ii.    Statutory Standing

In addition to constitutional standing, Sierra Club must also satisfy the two-pronged statutory standing inquiry.  First, Sierra Club must fall within the "zone of interests" of NEPA and the CWA.  *Lexmark*, 134 S. Ct. at 1388.  Under this prong, the determination of whether Sierra Club falls within the zone of interests is generally "a straightforward question of statutory interpretation," requiring the Court to look to the statute's purpose where that purpose is unambiguous.  *Id.*  Overall, the zone of interests test "is not especially demanding" and Sierra Club will fall within either statute's zone of interests as long as its interests are not "so marginally related to or inconsistent with the purposes implicit in the statute."  *Id.* at 1389 (internal quotation marks omitted).  Second, Sierra Club must demonstrate that its injuries were

proximately caused by the Defendants' wrongful conduct.  *Id.* at 1390.   Injuries that are "too remote" from the Defendants' conduct will not suffice.  *Id.* (internal quotation marks omitted).

Since Sierra Club alleges that the Defendants breached both NEPA and the CWA, the Court must consider the zone of interests of both statutes.   (Doc. 73 ¶¶ 2–3.)   As this Court has held previously, "a plaintiff must demonstrate three elements to fall within NEPA's zone of interests: (1) the defendant's failure to comply with NEPA 'adversely affected the environment,' (2) the defendant's failure to comply with NEPA caused plaintiff's injury, and (3) 'the alleged injury is environmental.'"  *RB Jai Alai, LLC v. Sec'y of the Fla. Dep't of Transp.*, 47 F. Supp. 3d 1353, 1363 (M.D. Fla. 2014).   Similarly, Eleventh Circuit precedent holds that environmental injuries—specifically those concerning the waters of the United States—are within the ambit of the CWA's zone of interests.  *See Black Warrior Riverkeeper*, 781 F.3d at 1280 ("All of these injuries fall within the zone of interests contemplated by the CWA and NEPA, since they allegedly stem from environmental harm."); *Fla. Pub. Interest Grp. Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070, 1085 (11th Cir. 2004) ("The harm that these individuals claim to have suffered—the pollution of waterbodies that they use and whose integrity the [CWA] is intended to protect—is the type the courts have recognized as an 'injury in fact.'").

Miami Corporation contends that Sierra Club "cannot allege and has not alleged any of the three elements necessary to establish [zone of interests] standing" because "no member of Sierra Club has suffered any damage or injury as a result of the actions

of the Corps."   (Doc. 78 at 10.)   For its part, the Corps argues that "[b]ecause Sierra Club's allegations do not state that the organization or its members are aggrieved within the meaning of NEPA or the [CWA], Sierra Club has not shown that it falls within the zone of interests for those statutes."   (Doc. 77 at 7 n.4.)   In response, Sierra Club states that it "alleges myriad environmental injuries which will flow from the Defendants' actions, including: fragmentation of habitat, loss of wildlife, degradation of regional watersheds, and wetlands loss" and that those injuries fall within the zone of interests of both statutes.   (Doc. 82 at 18–19.)

First, the Court notes that Sierra Club may properly avail itself of associational standing, averting any third-party standing issues, given that Sierra Club's members would have standing to sue in their own right, the environmental injury asserted is pertinent to Sierra Club's interests, and the claims asserted do not require the personal involvement of Sierra Club's members.   *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000) (holding that an organization may raise legal rights on another's behalf "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted not the relief requested requires the participation of individual members in the lawsuit.").   Sierra Club's alleged injuries also fall within the zone of interests of both the CWA and NEPA.   As the Court previously observed, Sierra Club's injuries constitute "prototypical environmental injuries": claims of environmental harm impacting natural areas where Sierra Club members often recreate.   The indisputably environmental character of Sierra Club's avowed injuries

brings the allegations of the Second Amended Complaint squarely within the zone of interests contemplated by both NEPA and the CWA.   *See Black Warrior Riverkeeper,* 781 F.3d at 1280 (holding that the zone of interests of both CWA and NEPA concern "environmental harm").   In particular, Sierra Club fulfills the tripartite NEPA zone of interests test, as Sierra Club claims that the Defendants' alleged failure to comply with NEPA will harm the environment, the injuries stem from a failure to comply with NEPA, and the injuries are environmental in nature.   *See RB Jai Alai*, 47 F. Supp. 3d at 1363. And Sierra Club's contentions also make explicit reference to the denigration of regional watersheds, thus bringing the Second Amended Complaint within the CWA's zone of interests as well.   *See Fla. Pub. Interest Grp. Citizen Lobby*, 386 F.3d at 1085 (holding that "pollution of waterbodies" falls within the sphere of the CWA's zone of interests).

   None of the Defendants challenge that Sierra Club's injuries were proximately caused by the misconduct alleged.   *See Lexmark*, 134 S. Ct. at 1390.   The Court therefore finds that Sierra Club has satisfied the CWA's and NEPA's statutory standing requirements sufficient to proceed past the pleading stage.

### 2.   Federal Question Jurisdiction

   Sierra Club's final jurisdictional hurdle is the District's federal question jurisdiction objection.   In particular, the District posits that "the APA . . . does not provide a cause of action against an agency of the state, like the District."   (Doc. 76 at 13.)   Additionally, the District asserts that it "has found no precedent for using the APA as a jurisdictional basis for alleging that an agency of [a] state has violated the [CWA]

federal mitigation bank regulations" and further insists that its actions are not subject to NEPA. (*Id.* at 12–15.) Sierra Club counters that the Court may properly assume jurisdiction despite the APA's general bar against suing state agencies. (Doc. 82 at 26–30.)

The APA allows for judicial review of final federal agency decisions concerning the CWA and NEPA. *See Sierra Club v. Flowers*, 526 F.3d 1353, 1359–60 (11th Cir. 2008). Because the APA is a federal statute primarily concerned with federal agencies, "the APA does not apply to state agencies," except in limited circumstances. *Citizens for Smart Growth v. Sec'y of the Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012). In *Citizens for Smart Growth v. Secretary of the Department of Transportation*, the Eleventh Circuit exerted jurisdiction over a state transportation agency because its "substantial role [was] well documented in the Administrative Record," the state agency was "a party working in tandem with federal agencies," and "the plaintiffs only sought injunctive relief" against the state agency. *Id.* at 1210.

Just as jurisdiction over a state agency was proper in *Citizens for Smart Growth*, it is proper here. Despite the District's protestations that "Sierra Club has not alleged any type of federal involvement in the challenged District permitting decisions or release of conservation easement—such funding or control—that would 'federalize' these actions," the principles gleaned from *Citizens for Smart Growth* counsel in favor of exerting jurisdiction over the District. (Doc. 76 at 14.) First, although the Administrative Record is not yet before the Court, Sierra Club suggests that it "likely includes much more information that will illuminate the involvement of the District in

the FMB." (Doc. 82 at 28.)  Sierra Club paints the District as "a key participant in administration and management of the FMB" due to its role as a member of the IRT that advises the Corps on management of the FMB and the fact that the District serves as "grantee of all conservation easements in the bank." (Doc. 82 at 27.)  These allegations serve to cast the District as "a party working in tandem with federal agencies," especially given the FMB's status as a joint federal and state mitigation bank, managed by both state and federal actors, subject to both state and federal law.  Furthermore, Sierra Club only asks the Court to issue injunctive relief, just as the *Citizens for Smart Growth* plaintiff.   At the motion to dismiss stage, without the benefit of the Administrative Record, Sierra Club's averments suffice to convince the Court that the District should be subject to federal jurisdiction in this case.

The District also states that "Sierra Club provides no support for its bald assertion that injunctive relief against the District is required to preserve [Sierra Club's] federal rights under NEPA" because "the District is not proposing to conduct any on-the-ground activity" and "the non-federal action that is authorized by the Districts issuance of the [CUP] is not dependent upon prior approval of a federal agency." (Doc. 76 at 16–17.)   These arguments misstate Sierra Club's position.   In fact, Sierra Club's precise argument is that the District's challenged actions were subject to federal statutory and regulatory preconditions that were ultimately abdicated by the Corps, the District, and Miami Corporation.   (Doc. 82 at 28–30.)   Moreover, the fact that the District itself has not proposed any development plans is not dispositive.   Sierra Club's asserted injury derives from private development of the land in question and the impact

of water withdrawals from the area, both of which are possible only because of the District's challenged actions.   Accordingly, any prospective injunctive relief enjoining development or setting aside District permits would necessarily implicate the District. Such injunctive relief would also be proper under federal law, assuming *arguendo*, that Sierra Club is ultimately vindicated.

Separately, the District posits that Sierra Club's claims are barred by the Eleventh Amendment.   (Doc. 85 at 9–10.)   Sierra Club responds that the District is not immune from suit pursuant to the *Ex parte Young* doctrine.   (Doc. 82 at 28–29.) As a general principle, "the Eleventh Amendment insulates states from suit in [f]ederal court [but] does not insulate state officials acting in their official capacities from suit in federal court, at least to the extent the complainant seeks prospective injunctive relief." *Welch v. Laney*, 57 F.3d 1004, 1009 (11th Cir. 1995).   This official capacity exception to the Eleventh Amendment's state sovereign immunity shield, derived from *Ex parte Young*, 209 U.S. 123 (1908), is grounded in a legal fiction that constructs an imaginary barrier between the state and its officers, deeming the officers to act without the state's authority when they contravene federal law.   *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1136–37 (11th Cir. 1999).   Courts confronting the *Ex parte Young* doctrine "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1646 (2011).   When the state is the real, substantial party in interest, the Eleventh Amendment still operates to bar suit.   *Pennhurst State Sch. & Hosp. v. Halderman*,

465 U.S. 89, 101 (1984).   If the action is "in essence one for the recovery of money from the state," the state is the real, substantial party interest, and is entitled to immunity.   *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945), *overruled on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002).

Here, *Ex parte Young* overcomes the District's sovereign immunity.   At the outset, the Court observes that Sierra Club's requested relief consists solely of declaratory and injunctive remedies, consistent with the requirements of *Ex parte Young.*   And although the District attempts to frame the relief sought as retroactive, in actuality, Sierra Club seeks to quell ongoing alleged breaches of federal law.   While Sierra Club's injuries certainly originated with the District's past actions, the purported violations of the CWA's mitigation banking regulations and NEPA's environmental assessment requirements are ongoing, as Sierra Club claims that the Defendants continue to disregard those federal laws.   Furthermore, the environmental harm Sierra Club complains of will result from the reasonably probable, prospective development of the subject land.   *See S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332 (4th Cir. 2008) ("SCWF also seeks to enjoin [construction] prior to full compliance with NEPA . . . [a] prayer for such injunctive relief is a prospective claim against an action that would violate federal law.").   Nor does the District's conclusory averment that "the relief sought implicates the interests of [the District], not individual state officials," foreclose application of *Ex parte Young*.   (Doc. 85 at 10.)   The District never claims that the instant action is "in essence one for the recovery of money from the state," and Sierra

Club's prayer for relief contains no demand for money damages, beyond attorney's fees and costs.   Accepting the District's argument that it is immune from suit simply because the actions at bar "implement state regulatory programs and affect the District's interests in those programs," would eviscerate *Ex parte Young*, since nearly every lawsuit naming a state official in their official capacity implicates a regulatory program in some way.   Thus, the Eleventh Amendment does not stand in the way of the Second Amended Complaint.

### B.     Ripeness

Apart from their standing and jurisdiction arguments, the Defendants each argue that the Second Amended Complaint must be dismissed because the averred injuries are not yet ripe.   (Doc. 76 at 12; Doc. 77 at 8–9; Doc. 78 at 13–15.)   Sierra Club's rejoinder is that its claims "are presently ripe for review" because its claims ripened at the moment the Defendants failed to comply with NEPA and the CWA. (Doc. 82 at 20.)

"[R]ipeness . . . is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ouachita Watch League*, 463 F.3d at 1174 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).   While standing doctrine asks whether the *parties* to a lawsuit are proper, ripeness doctrine asks whether the *timing* of a lawsuit is appropriate.   *See Wilderness Soc'y v. Alcock*, 83 F.3d 386, 389–90

(11th Cir. 1996).   Generally, a court's ripeness query is guided by two principles: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.   *See id.* at 390 (citing *Abbott Labs.*, 387 U.S. at 149)).   However, procedural injury cases "add[] an important twist."   *Ouachita Watch League*, 463 F.3d at 1174.   That is, "the issue is ripe at the time the agency fails to comply."   *Id.*   "[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."   *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998); *see also Anacostia Watershed Soc'y v. Babbitt*, 871 F. Supp. 475, 480 (D.D.C. 1994) ("Gone is the Park Service's authority to limit the leasing of National Park lands, to protect the value and integrity of the lands and to preclude or regulate development.").

Against this jurisprudential backdrop, the Court's ripeness analysis becomes relatively straightforward. [8]   As the Court has already observed, Sierra Club's professed injuries satisfy the relevant Article III imminence standards.   Accordingly, the only outstanding question, for the purposes of the Court's ripeness analysis, is whether the Defendants have already allegedly failed to comply with NEPA and the CWA. *See Ouachita Watch League*, 463 F.3d at 1174 ("The issue is ripe at the time the agency fails to comply.").   It is clear from the Second Amended Complaint that the

---

[8]   All of the Defendants' ripeness arguments proceed under the traditional two-prong ripeness test.   (*See* Doc. 76 at 12; Doc. 77 at 8–9; Doc. 78 at 13–15.)   While this is usually the ripeness analysis the Court must apply, Eleventh Circuit precedent unambiguously directs the Court to apply the special procedural injury ripeness test to the case at bar.   *See Ouachita Watch League*, 463 F.3d at 1174.

Defendants' asserted noncompliance occurred at the moment the challenged actions occurred, meaning that each of Sierra Club's claims are currently ripe for adjudication.

### C.     Preclusion

The District also argues that "Sierra Club had an available and adequate remedy under the Florida Administrative Procedures Act, Chapter 120, Florida Statutes, to challenge issuance of the state permit modification and issuance of the state [CUP]." (Doc. 76 at 20.)   According to the District, because "[t]he state courts of Florida give preclusive effect to unappealed final agency decisions . . . [a]ny objection to issuance of the permits that could have been raised in an administrative proceeding has been waived."   (Doc. 76 at 22.)   Sierra Club did not respond to the District's argument.

"Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal court must give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered." *Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, (11th Cir. 2010) (internal quotation marks omitted).   But while the Full Faith and Credit Act imbues state judicial decisions with preclusive effect in federal courts, it "is not applicable to the unreviewed state administrative fact-finding . . . ." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 794 (1986).   Instead, federal common-law rules of preclusion require federal courts to give a state agency's fact-finding the same preclusive effect to which it would be entitled in that state's courts when "a state agency act[s] in a judicial capacity [and] resolves disputed issues of fact properly before it in which the parties have had an adequate opportunity to litigate . . . ." *Id.* at 799.   There are two caveats to this general rule.   First, if Congress manifests clear intent to

abrogate the common law rule of preclusion, a court must conform to such congressional intent. *See id.* at 797 ("Nothing in the language of § 1793 remotely expresses any congressional intent to contravene the common-law rules of preclusion . . . ."). Second, when facing vindication of certain federal rights, the Eleventh Circuit will foreclose application of claim preclusion to unreviewed state agency rulings. *See Gjellum v. Birmingham*, 829 F.2d 1056, 1064–65 (11th Cir. 1987) ("With respect to the claim preclusive effect of unreviewed state agency rulings, we conclude that the importance of the federal rights at issue, the desirability of avoiding the forcing of litigants to file suit initially in federal court rather than seek relief in an unreviewed administrative proceeding, and the limitations of state agencies as adjudicators of federal rights override the lessened federalism concerns implicated outside the contours of the full faith and credit statute . . . therefore [] at least in the context of section 1983 suits, the federal common law of preclusion does not require application of state claim preclusion rules to unreviewed state administrative decisions.").

Florida courts hold that orders of state agencies acting in a "quasi[-]judicial" capacity are "governed by the same rules regarding res judicata or estoppel as are applicable to the judgments or decrees of courts." *Wurwarg v. Lighthouse Rest.*, 131 So. 2d 469, 471 (Fla. 1961). Res judicata, also known as claim preclusion, bars relitigation of "the same cause of action" where "[a] judgment on the merits rendered in a former suit between the same parties or their privies" has been issued. *Fla. Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001) (alteration omitted).

"Importantly, the doctrine of res judicata not only bars issues that were raised, but it also precludes consideration of issues that could have been raised but were not raised in the first case." *Id.*   Four conditions must be present for res judicata to apply: "(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity of the quality in persons for or against whom claim is made." *Fla. Bar v. St. Louis*, 967 So. 2d 108, 119 (Fla. 2007) (per curiam).   On the other hand, collateral estoppel, or issue preclusion, "serves as a bar to relitigation of an issue which has already been determined by a valid judgment." *Stogniew v. McQueen*, 656 So. 2d 917, 919 (Fla. 1995).   In Florida, collateral estoppel requires "[1] the parties and issues be identical, [2] the particular matter be fully litigated and determined, [3] in a contest which results in a final decision, [4] in a court of competent jurisdiction." *Dep't of Health & Rehab. Servs. v. B.J.M*, 656 So. 2d 906, 910 (Fla. 1995).

Based on the District's showing in its motion to dismiss, the Court cannot conclude that the claims and issues in the Second Amended Complaint are precluded. Though the District baldly asserts that Sierra Club is barred from bringing the claims in the Second Amended Complaint, the District provides scant evidence for that proposition.   Put simply, the District leaves the Court with far too many unanswered questions concerning the hypothetical state agency action Sierra Club apparently waived.   For example, the District declines to inform the Court as to whether the state agency would be acting "in a judicial capacity" or whether the parties would have an "adequate opportunity to litigate" their federal causes of action, within the meaning of

the federal common law of state agency preclusion.   *See Elliott*, 478 U.S. at 799.   Nor

does the District supply argument concerning whether such a hearing would be "quasi-

judicial" pursuant to Florida law of preclusion.   *See Wurwarg*, 131 So. 2d at 471.   And

most tellingly, the District's brief never argues with any specificity that either claim

preclusion or issue preclusion has attached to Sierra Club's claims, let alone mentions

the four-factor analysis attendant to each doctrine.   Given the dearth of argument and

factual development on the question of preclusion, the Court is unwilling to deny Sierra

Club the opportunity to bring their federal claims in federal court.[9]

### D.   Failure to State a Claim

Finally,[10]   the District contends that that the Second Amended Complaint should

be dismissed "because [] Sierra Club failed to state a claim against the District."

---

[9]   In any event, even if the District more fully developed its preclusion argument, the Court would still be reluctant to impose preclusion, given the federal nature of Sierra Club's claims.   *See Gjellum*, 829 F.2d at 1065 (holding that since § 1983 was "intended to provide a *federal* forum for the vindication of federal rights . . . [a]llowing a state to dictate that an unreviewed decision of a state agency will foreclose litigation of a section 1983 claim even if the issues comprising the claim were not presented or decided by the agency would therefore by directly contrary to Congress' intent . . . .").   Put another way, it strikes the Court as unlikely that a state administrative hearing would provide a "genuine [non-futile] opportunity" to air federal statutory and regulatory grievances.   *See Porter v. Schweiker*, 692 F.2d 740, 743 (11th Cir. 1982) (observing that exhaustion is not required if a remedy does not "provide a genuine opportunity for adequate relief" or if "the established administrative procedures would prove unavailing or futile"). However, the Court does not rest its holding on this footnote, given the District's inadequate preclusion argumentation.

[10]   The Court notes that the District also asks the Court to "strike the relief requested against [it]" while Miami Corporation separately argues that summary judgment should be entered in its favor.   (Doc. 76 at 23; Doc. 78 at 15–17.)   At this point, it is enough to observe that the Court will not strike the relief requested against the District, given the Court's prior analysis.   And, at this preliminary stage of the proceedings, summary judgment is inappropriate.

(Doc. 76 at 17.)   Specifically, the District argues that the Second Amended Complaint "suffers the same flaw as the prior complaint" and that the cited CWA regulations "do not govern decisions by the District, which is an agency of the state of Florida." (*Id.* at 18.)

The Second Amended Complaint states a claim upon which relief can be granted.   Though the District protests to the contrary, Sierra Club adequately explains how it believes the District is subject to, and ultimately violated, the cited CWA regulations.   That is, Sierra Club avers that the District's "significant role in the FMB, working in tandem with the Corps to administer and manage the FMB . . ." subjects the District to those federal laws governing the administration of federal mitigation banks. (Doc. 73 at ¶¶ 72–75.)   Sierra Club further isolates the "ecological sustainability, site protection, perpetual preservation, [and] monitoring and performance" requirements embedded in 33 C.F.R. § 332 as the regulatory obligations that the District purportedly breached when it granted the Permit, released a conservation easement, and issued the CUP. (*Id.* ¶¶ 70–72.)   At the motion to dismiss stage, Sierra Club's allegations suffice to state a claim against each of the Defendants.

## IV.   CONCLUSION

Upon due consideration, the Court concludes that Sierra Club has standing to bring the instant lawsuit.   Sierra Club also provides an adequate basis for the Court's exercise of federal question jurisdiction.   Additionally, Sierra Club's claims are ripe for adjudication and are not barred by the doctrines of preclusion or exhaustion.   Finally, Sierra Club cured the deficiencies in the Amended Complaint, so the Second Amended

Complaint properly states a claim upon which relief may be granted.

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Defendant St. Johns River Water Management District's Dispositive Motion to Dismiss Second Amended Complaint for Lack of Subject-Matter Jurisdiction and Failure to State a Claim Upon Which Relief Can be Granted and Motion to Strike (Doc. 76) is **DENIED**.

2. Defendant United States Army Corps of Engineers' Rule 12(b)(1) Motion to Dismiss (Doc. 77) is **DENIED**.

3. Intervenor Miami Corporation's Motion to Dismiss Plaintiff's Second Amended Complaint, or in the Alternative, Motion for Summary Judgment (Doc. 78) is **DENIED**.

4. Any Defendant who has not yet done so shall answer the Second Amended Complaint **within fourteen (14) days** of this Order.

5. **Within ten (10) days** following the date of this Order, the parties are **DIRECTED** to file the Administrative Record with the Court, pursuant to the Court's Scheduling Order (Doc. 65).

**DONE AND ORDERED** in Orlando, Florida on this 6th day of November, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record